## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **GOLDEN NUGGET LAKE CHARLES, LLC,** ) | |
| **f/k/a Ameristar Casino Lake Charles, LLC,** ) | |
| **f/k/a Creative Casinos of Louisiana, LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. _____** |
| ) | |
| **W.G. YATES & SONS** ) | |
| **CONSTRUCTION COMPANY,** ) | |
| ) | |
| **Defendant.** ) | |

### COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

COMES NOW Plaintiff Golden Nugget Lake Charles, LLC, f/k/a Ameristar Casino Lake Charles, LLC, f/k/a Creative Casinos of Louisiana, LLC, which files its Complaint for Breach of Contract, Breach of Warranty, Negligence, Negligent Misrepresentation, Negligent Suppression, and Declaratory Judgment against Defendant W.G. Yates & Sons Construction Company, and, in support thereof, alleges the following:

### PARTIES

1.     Plaintiff is Golden Nugget Lake Charles, LLC, f/k/a Ameristar Casino Lake Charles, LLC, f/k/a Creative Casinos of Louisiana, LLC ("Owner"),[1] a limited liability company organized in the State of Louisiana and which maintains its principal place of business in Louisiana.  Creative Casinos of Louisiana, LLC changed its name to Ameristar Casino Lake Charles, LLC in August 2012; and Ameristar Casino Lake Charles, LLC changed its name to Golden Nugget in November 2013.

---

[1] All terms not specifically defined herein are assigned the definition set forth in Article 1 of the Agreement.

2.      Defendant is W.G. Yates & Sons Construction Company ("Contractor"), a corporation which is incorporated in the State of Mississippi and which maintains its principal place of business in Mississippi.

## JURISDICTION

3.      Yates is subject to the jurisdiction of this Court.  Additionally, this Court has subject matter jurisdiction under 28 U.S.C. § 1332, because (1) there is complete diversity of citizenship among the parties, and (2) the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

## VENUE

4.      Venue is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in the State of Louisiana and within this District.

## INTRODUCTION

5.      Golden Nugget Lake Charles Hotel & Casino is an approximately $700 Million luxury five-star resort located in Lake Charles, Louisiana, which first opened to the public in December 2014.  The vast majority of the project has been paid for by Owner for some time.  However, since the opening of the project, Owner and Contractor have been engaged in a series of disputes related to evidence of overbilling by Contractor and the failure of Contractor to correct work that does not conform to the high quality standards agreed upon in the construction contract.  Currently, approximately $18.7 Million (or 2.5% of the overall project value) is being withheld by Owner to protect itself against estimated potential damages suffered by Owner as a result of Contractor's actions (which is a right afforded to Owner under the construction contract).  Moreover, Contractor, in recognition that claimed amounts may not be owed to its

2

own subcontractors, has even refused to pay its subcontractors as a result of Owner exercising its rights under the construction contract.  Notwithstanding the ongoing disputes, as a sign of good faith by Owner and in order to alleviate financial hardship on certain subcontractors who were not being paid by Contractor, Owner has paid to Contractor, for the benefit of certain subcontractors, an additional Eleven Million One Hundred Two Thousand Six Hundred Thirty Seven and 64/100 Dollars ($11,102,637.64) since these disputes first arose.  Owner is ready, willing and able to pay all amounts properly owed under the construction contract and has on deposit in a designated construction bank account an amount sufficient to pay Contractor in full. However, Contractor's continued failure to perform basic corrective obligations and refusal to permit access to books and records in the face of credible evidence that overbilling has occurred, makes this lawsuit necessary in order to preserve and enforce the rights of Owner under the construction contract.  A general summary of Contractor's breaches is set forth below.

6.      First, Contractor has repeatedly refused to allow Owner to exercise its contractual right to fully access, review and audit all of the books and records of Contractor and its subcontractors regarding their claims for payment from Owner.  This is a critical bargained-for right of Owner because Owner's payment obligation depends entirely on the actual amount of costs properly incurred by Contractor and its subcontractors.  Owner has previously discovered credible evidence which indicates that Contractor has overbilled Owner, raising  legitimate concerns on the part of Owner that Contractor's requests for payments do not accurately reflect the costs permitted to be charged to Owner under the contract, and that Contractor has overbilled Owner for unjustified costs on this Project.  And yet, notwithstanding Owner's legitimate basis for concern, Contractor has refused to provide access to all of the books and records of Contractor and its subcontractors.

7.     Second, there are numerous items in the project that do not meet the quality standards under the contract, but Contractor has either failed or refused to complete these items despite repeated demands from Owner to do so.  The contract requires the highest quality standard consistent with five-star luxury resorts, and yet Contractor has repeatedly refused to abide by this standard of quality – a standard that was specifically bargained for by Owner and for which a premium was paid.

8.     Due to the foregoing failures by Contractor, on June 10, 2015, Owner gave notice to Contractor and its surety that it was considering placing Contractor in default under the construction contract and requested a meeting with Contractor and its sureties.  The parties subsequently held a meeting on July 16, 2015, to discuss the ongoing deficiencies in Contractor's work and Contractor's blatant refusal to allow Owner to audit Contractor's invoices.  Since that meeting, Owner has demonstrated tremendous good faith and has worked with Contractor to resolve Contractor's deficiencies, including paying Contractor an additional amount of Eleven Million One Hundred Two Thousand Six Hundred Thirty Seven and 00/100 Dollars ($11,102,637.64) since Owner's June 10, 2015 notice.  In total Owner has paid Contractor Four Hundred Twenty-Nine Million Eighty Nine Thousand Seven Hundred Fifteen and 00/100 Dollars ($429,089,715.00).  Notwithstanding the foregoing and Owner's repeated good faith efforts at resolution, Contractor has, among other things, thumbed its nose at Owner and has refused to correct defective and non-conforming work and has refused to allow Owner to access its books and records. As a result, Owner has been forced to exercise its withholding rights and begin to self-perform corrections on items not meeting the high quality standards under the construction contract.  Most recently, and after repeated efforts by Owner to amicably resolve all

issues, Owner was left with no alternative and by letter dated November 24, 2015, Owner placed Contractor in default.

9.     Owner is ready, willing, and able to pay all amounts properly owed under the construction contract.  However, in light of Owner's justified concerns, as provided herein, Owner must exercise its contractual right to withhold amounts to protect itself from damages. Owner must be allowed to perform necessary audits of all books and records relating to the project and review back-up documentation supporting amounts previously billed and yet to be billed in order to determine the amount of credits due Owner for overbilling or unjustified charges. Additionally, Contractor is required to promptly correct outstanding items not conforming to the high quality standards of the contract.  For the foregoing reasons, and as more particularly described below, Owner is filing this lawsuit for (1) Breach of Contract; (2) Breach of Express Warranty; (3) Breach of Implied Warranty; (4) Negligence; (5) Negligent Misrepresentation; (6) Negligent Suppression; and (7) seeking a Declaratory Judgment regarding its rights to back-up documentation and conduct audits of the costs submitted by Contractor for payment.

## FACTS

**A.     The cost-plus construction contract with guaranteed maximum price was executed in 2011, and was since amended.**

**1.     The Agreement governing this project was executed in 2011.**

10.     On or around August 5, 2011, Owner, and Contractor entered into a "cost of the work, plus a fee with a guaranteed maximum price" construction contract designated "Agreement for Guaranteed Maximum Price Construction Services" (the "Agreement") in which Contractor agreed to construct a "**'five-star' first class luxury resort** . . . including a high-rise hotel space and low rise space comprised of casino and gaming areas, restaurants, retail, spa,

convention and meeting areas" and other related features and structures at the Golden Nugget Lake Charles project in Lake Charles, Louisiana, f/k/a Ameristar Casino Resort Spa Lake Charles, f/k/a Mojito Pointe at Lake Charles, Louisiana (the "Project").

### a.   The Agreement sets forth the scope of work and specifications.

11.   Contractor's scope of work under the Agreement is set forth in the Agreement, as amended, and includes construction and supervision of the entire Project, including construction "directly and through Subcontractors and Vendors" of "a high-rise hotel space and low rise space comprised of casino and gaming areas, restaurants, pools and recreation areas, public and employee parking structures, pools and recreation facilities, together with all exterior features, and all on–Site and off-Site improvements and infrastructure related thereto, all in accordance with the Contract Documents" (the "Work").

12.   Article One of the Agreement established that the "Specifications" were those portions of the "Contract Documents" that "set forth the written requirements for materials, equipment, construction systems, standards and workmanship for the Work," including but not limited to those attached as Exhibit G to the Agreement.

### b.   The Agreement establishes a cost-plus with GMP basis for payment.

13.   Per Section 3.1 of the Agreement, the basis for payment to Contractor was to be the Cost of the Work plus a Contractor's Fee of 2.25% of the Cost of the Work, subject to a Guaranteed Maximum Price of Four Hundred Thirty-Seven Million Seven Hundred Seventy Six Thousand Five Hundred Seventy Three and 00/100 Dollars ($437,776,573.00) (this Guaranteed

Maximum Price, as subsequently revised, is referred to herein as the "GMP" or "Guaranteed Maximum Price").[2]

14.     Under Section 3.2, the "Cost of the Work" is limited to those amounts that "are chargeable to Owner and payable to Contractor when reasonably, properly, actually and necessary incurred by the Contractor during or in connection with performance of the Work, without mark-up or add on of any kind by or at the request of the Contractor", "subject to verification by audit."

15.     Pursuant to Section 3.1, costs that would cause the GMP "to be exceeded shall be paid by the Contractor without reimbursement by Owner."

        **c.     The Agreement can only be modified through written changes executed by Owner.**

16.     Under Section 18.1 of the Agreement, a "'Change' in the Work means an increase, decrease, variation, modification or change in the scope of Contractor's Work."  Under Section 18.1, "[a] Change can only be implemented by a Change Order or a Construction

---

[2] The original GMP was for Two Hundred Sixty-Five Million Eight Hundred Twenty-Six Thousand Nine Hundred Ninety Two and 00/100 Dollars ($265,826,992.00).   The Agreement was amended by Contractor and Owner on July 16, 2012.  ("First Amendment").  Contractor and Owner subsequently executed a second amendment to the Agreement, which was effective on July 15, 2013 (the "Second Amendment").   Under Section 1 of the Second Amendment, the Guaranteed Maximum Price was increased to Three Hundred Ninety-Three Million Five Hundred Sixty-Four Thousand Two Hundred Sixty and 00/100 Dollars ($393,564,260.00).

Contractor and Owner executed that certain written "Change Order to Agreement for Guaranteed Maximum Price Construction Services" effective November 25, 2014 ("Change Order One") under which the Guaranteed Maximum Price was again revised upward to the current GMP of Four Hundred Thirty-Seven Million Seven Hundred Seventy-Six Thousand Five Hundred Seventy-Three and 00/100 Dollars ($437,776,573.00) (the "Second Revised GMP").

The GMP was never intended by the parties to be a fixed construction price.  Rather, the GMP was to be a cost cap that could not be exceeded.  Moreover, pursuant to Section 3.2, if the final Cost of the Work was less than the GMP, then Contractor would receive as an incentive payment thirty percent (30%) of the difference between the total cost of the work under the Agreement and the GMP.

Change Directive," and under Sections 18.2 and 18.4.1, both Change Orders and Construction Change Defectives require the Owner's signature to be effective.

17.     Furthermore, Section 18.1 expressly provides that "no course of conduct or dealings between the parties, nor express or implied acceptance of alterations or additions to the Work, and no claim that Owner has been unjustly enriched by any alteration or addition to the Work, whether or not there is in fact any such unjust enrichment, shall be the basis for any claim to an increase in the Guaranteed Maximum Price or extension of the Contract Time."

18.     Under Section 24.13 of the Agreement, "[n]o modifications of the Contract shall be binding unless executed in writing by the parties to this Agreement."

**B.     Construction schedule and status.**

19.     Under the Agreement, the "Notice to Proceed" and "Date of Commencement" under the Agreement was "July 20, 2012" (*See* First Amendment, Section 3); the "Guaranteed Date of Substantial Completion" was "August 17, 2014" (*See* Second Amendment, at Section 5), and the "Guaranteed Date of Final Completion" was one hundred twenty (120) calendar days after Substantial Completion. (*See* Agreement at Section 4.1.6).

20.     The Certificate of Substantial Completion for certain portions of the Project, with a list of some of the outstanding items to be completed by Contractor, was executed by Owner, Contractor, and the Project's architect on December 1, 2014.[3]

21.     The Project opened to the public on December 6, 2014.

22.     Following Substantial Completion, pursuant to Section 12.2 of the Agreement, the Contractor is obligated to achieve "Final Completion," which includes "(a) completion of all

---

[3] Separate Certificates of Substantial Completion for other portions of the Project were executed on April 16, 2015.  However, other Work contemplated by the Agreement has not been completed as of the date of the filing of this Complaint.

Punch List Items,… and (e) all obligations of Contractor under the Contract Documents (except for those obligations which are intended to be satisfied after Final Completion).

23.     Throughout 2015, Owner has repeatedly sought Contractor's assistance in completing the Work, achieving Final Completion and in allowing Owner to verify the costs included in Contractor's pay applications through a review and audit of back-up documentation, including all books and records of Contractor and its subcontractors; however, Contractor has repeatedly refused to allow Owner to audit the subcontractors' costs. Moreover, due to breaches by Contractor, Owner was forced to perform certain work and incurred significant costs including, but not limited to, costs to clean the Project for which Owner is entitled to a credit under the Agreement.

**C.     Contractor refused to comply with Agreement regarding audit rights and providing back-up documentation.**

     **1.     The Agreement established Contractor's obligation to provide back-up documentation to support its claims for payment and the Owner's right to audit the Contractor and its subcontractors for cost verification.**

24.     Pursuant to Section 19.1 of the Agreement, Contractor is obligated to "at all times implement and maintain (and require all Subcontractors and Vendors to implement and maintain) such cost control systems and daily record keeping procedures as may be necessary to attain proper fiscal managements and detailed financial records for all costs related to the Work."

25.     Section 19.2 of the Agreement requires that Owner "shall have the right to fully and completely audit, copy, investigate and review, and shall be afforded useful access to all of the records described in Section 19.1 above at all reasonable times (both during performance of the Work and after Final Completion) for purpose of inspection, audit, review and copying to the full extent as Owner or Owner's Lenders may require relating to the Work or the Contract."

26.     Additionally Section 19.2 provides that "[u]pon request, Contractor shall also fully cooperate in arranging interviews with Contractor's employees and shall require all Subcontractors and Vendors to likewise fully cooperate pursuant to this Article 19."

27.     Section 5.2.2 of the Agreement also requires that Contractor shall support its Application for Progress Payment with relevant documentary evidence for cost verification purposes as Owner and Owner's Lenders may reasonably require. . . . To the extent requested by Owner or Owner's Lenders, this shall include providing audit access to Contractor's books and records to the extent described in Article 19 of this Agreement."

28.     Finally, Section 11.11.1 expressly requires that Contactor include the requirements of Article 19 (Recordkeeping and Audit Rights) in all of its subcontracts and purchase orders and, pursuant to Section 11.11.2, Contractor is responsible for fully indemnifying, and holding harmless, Owner from any and all liens, claims, lawsuits, costs and expenses, including attorneys' fees, which may arise from Contractor's failure to enforce the flow-down provisions required by Section 11.11.1.

### 2.     Contractor submitted untimely claims and failed to provide adequate back-up documentation to support the claims.

29.     Throughout the Project, claims for payment submitted by Contractor were often unsubstantiated, lacking conventional back-up documentation, and/or were disputed by Owner due to lack of written authorization via Change Order or Construction Change Directive.

30.     After the project opened to the public, and as late as June 2015, Contractor has continued to submit additional subcontractor costs to Owner for work, much of which was work in excess of the Guaranteed Maximum Price, and for work and costs never authorized by Owner in accordance with the Agreement.

31.     Owner has disputed many of the invoices submitted by Contractor due to, among other reasons, (i) the lack of any written Owner-executed Change Order or Construction Change Directive authorizing the additional work, (ii) the lack of supporting documentation submitted by Contractor, (iii) the unreasonable delay in submitting these costs to Owner, (iv) Contractor's refusal to permit any auditing whatsoever, (v) potential overbilling,  and/or (vi) credits being due Owner.

32.     Notwithstanding the foregoing, Owner has, at all times, (i) been ready, willing and able to pay all amounts properly owed to Contractor pursuant to and in accordance with the Agreement and (ii) attempted to work with Contractor and all Subcontractors in good faith to resolve all payment disputes.

**3.      Contractor has failed to provide Owner full access to its records and those of its subcontractors for cost verification purposes, and the limited access provided revealed numerous evidence of incorrect Cost submitted to Owner for payment.**

33.     Pursuant to its rights under Article 19 of the Agreement, Owner retained a third party auditor to audit Contractor and certain of its subcontractors for cost verification.

34.     On April 21, 2015, Owner requested that Contractor allow and assist it in performing audits of both Contractor, and five of its largest subcontractors that collectively represented in excess of $275 Million of the claimed Cost of the Work.

35.     Contractor did not comply with this request.

36.     Owner made additional requests on May 6, 2015 directly to Edwards Electric Service, LLC ("Edwards") and Jesco, Inc. ("Jesco"), which are subcontractors of Contractor[4]

---

[4] It is also worth noting that, upon information and belief, Owner understands that both Edwards Electric Service, LLC and Jesco, Inc. are affiliates of Contractor.

representing more than $110 Million in claimed cost of the Work.  However, in both cases, Owner was refused access to books and records by these subcontractors.

37.     On June 10, 2015, Owner sent Contractor a notice of intent to place Contractor in default for its refusal to provide full access to books and records for the purpose of conducting an audit of Costs of the Work.

38.     On July 16, 2015, Owner met with Contractor and its surety to discuss the ongoing deficiencies in Contractor's performance.

39.     In or around September 2015, Owner was provided limited access to a portion of the requested documents for some of the requested subcontractors.

40.     In or around September 2015, Owner performed a preliminary audit of the Owner Controlled Insurance Program ("OCIP") to determine whether credits were due from various subcontractors pursuant to the mandatory program set forth in Section 15.1.9 of the Agreement.

41.     By letter dated September 15, 2015, Owner notified Contractor that it formally rejected a proposed increase of Eight Hundred Seventy-Five Thousand Thirty Four and 00/100 Dollars ($875,034.00) to the Cost of the Work relating to OCIP credits, and that additional credits should be owed to Owner due to Contractor's failure to properly manage its subcontractors obligations to participate in the OCIP program.

42.     Prior to Owner's September 15, 2015 letter, Owner notified Contractor of concerns regarding Contractor's compliance with the OCIP.

43.     Additionally, in or around September 2015, Owner performed preliminary audits of the pay applications submitted by Edwards and its sub-subcontractor Lake Charles Electric Company LLC ("LCE"), and those submitted by Jesco and its sub-subcontractor mechanical Construction Co., LLC ("MCC") based on the limited documents provided by Contractor.

44.     By letter dated September 30, 2015, Owner notified Contractor that the records it reviewed indicated that the documents submitted in relation to Edwards's and LCE's work on the Project did not substantiate the amount requested and previously paid to Edwards and LCE. Specifically, Owner notified Contractor that its audit found overbillings totaling $1,443,860 related to, among other things, overstated labor burdens, overstated truck rates, and small tool purchases.

45.     Based on this preliminary audit, Owner demanded additional back-up documentation and notified Contractor that Owner disputed One Million Four Hundred Forty Three Eight Hundred Sixty and 00/100 Dollars ($1,443,860.00) in charges relating to Edwards and LCE, would be withholding this amount from the related pay applications, and that the Owner would be making a Claim in this amount against Contractor.

46.     By separate letter dated September 30, 2015, Owner also notified Contractor that the records it reviewed indicated that the documents submitted in relation to Jesco's and MCC's work on the Project did not substantiate the payments requested and/or amounts that were previously paid.  Specifically, Owner notified Contractor that its audit found overbillings totaling at least $4,613,375 relating to, amongst other things, duplicative travel/lodging charges, overstated labor burdens and small tool purchases.

47.     Based on this preliminary audit, Owner demanded additional back-up documentation and notified Contractor that Owner disputed Four Million Six Hundred Thirteen Thousand Three Hundred Seventy Five and 00/100 Dollars ($4,613,375.00) in charges relating to Jesco and MCC, would be withholding this amount from the related pay applications, and that the Owner was making a Claim in this amount against Contractor.

48.     Contractor has not provided the additional documents and/or access to books and records needed to complete a final audit of the OCIP program and amounts previously paid to, or requested by, Jesco, MCC, Edwards, LCE, or other subcontractors.

49.     Without being afforded a meaningful opportunity to review accurate and contemporaneous information and conduct required audits, Owner is not in a position to verify that the amounts previously paid by Owner or those that Contractor or its subcontractors have or will claim are, in fact, justified (much less being charged in accordance with the Agreement), or whether Owner is entitled to additional substantial credits for overbilling by Contractor.

50.     Owner's ability to perform a comprehensive audit of Contractor's and its Subcontractors' books and records is vital to achieving Project completion and maintaining transparency with respect to the billing and cost review process.

51.     Contractor's refusal to comply with Owner's requests, despite numerous demands and Owner's good faith efforts to achieve resolution, places Contractor in material breach of the Agreement.

52.     In addition, Section 19.1 of the Agreement provides that "Contractor's failure to cooperate or to provide access as described in this Article 19 shall be a material breach of this Contract."

**D.     Contractor failed to perform certain work under industry standards or the Agreement's required heightened quality standard.**

    **1.     The Agreement established a required heightened "five star" quality standard for Contractor's work and Contractor provided an express and implied warranty for the Work.**

53.     In Section 7.1.9 of the Agreement, Contractor represented, warranted and covenanted with Owner the following:

(a) that the Project involves the construction of a **"five star" first class luxury resort** as set forth in the Guaranteed Maximum Price Premises and Assumptions and the Contract Documents, (b) **that the contract Price reflects a premium** in the amount Contractor (or a third party contractor with similar experience, skill and reputations as Contractor) would charge for the construction of the Work, and (c) that **such premium is a direct reflection of Owner's stringent requirements and high expectations for the quality of the Work**.

54.     Moreover, in Section 26.2 of the Agreement, Contractor also covenanted to Owner that:

the Work will be performed in accordance with the Contract Documents and the **best practices, methods and standards** followed by contractors constructing **"five star" first class luxury resorts** as set forth in the Guaranteed Maximum Price Premises and Assumptions, and casinos, i.e., **employing the highest standards with respect to the design, construction, operation and maintenance of facilities and equipment** of the type to be incorporated into the Work, and in a good and workmanlike manner and it shall be free from defects.

55.     Accordingly, under the Agreement, the Owner agreed to pay, and Contractor acknowledged that it was being paid, a premium (as reflected in the Agreement) in exchange for the Contractor constructing the Project according to a heightened standard that required "the highest standards" so that the resulting product was a "'five star' first class luxury resort" meeting "Owner's stringent requirements and high expectations for the quality of the Work."

56.     Furthermore, under Section 10.1 of the Agreement, "Contractor guarantees, represents and warrants to Owner that":

(a) the Work . . . shall be <u>**first class in quality, free from all defects whatsoever**</u> (including without limitation, patent, latent or developed defects or inherent vice), commensurate with the <u>**highest standard for construction practices and quality applicable to first class projects associated with luxury resorts**</u>, and in strict conformance with the Contract Documents (including, but not limited to, the Guarantee Maximum Price Premises and Assumptions), and (b) all materials, appliances, mechanical devices, equipment and supplies incorporated into the Work shall be new and of such quality to strictly met or exceed the Specifications and requirements of the Contract Documents. . . . All Work not conforming to the requirements of this Section (including, but not limited to, substitutions or deviations not properly approved and authorized by Owner in writing) shall be considered defective.

15

57.     Sections 10.2 and 10.3 of the Agreement make clear that the warranty provided by Contractor pursuant to Section 10.1 is applicable to all Work and continues for a period of at least one (1) year from the date of issuance of the Certificate of Substantial Completion as to all Work.

58.     Additionally, Section 10.5 of the Agreement is clear that Contractor is obligated "to use all best efforts to fully perform all warranty and corrective services to Owner's satisfaction."

59.     Under Section 10.5 of the Agreement, if non-conforming Work cannot be corrected within five (5) calendar days, Contractor is required to itemize "all corrective actions necessary which Contractor is prepared to and shall immediately undertake and diligently pursue to enable the Work to achieve strict compliance with the Contract Documents."

60.     Under Section 12.1.3 of the Agreement, Owner's acceptance of Substantial Completion . . . shall not in any manner constitute a waiver by Owner of any of the provisions or requirements of the Contract Documents, including, but not limited to Contractor's warranty obligations."

61.     Section 10.5 of the Agreement further states clearly that "in performing such corrective Work, Contractor shall perform its Work so as to cause the least inconvenience and disruption to Owner's business which may require performance of Work at hours when Owner's business is least active."

62.     Under Section 10.11 of the Agreement, "[a]t Owner's request, Contractor shall, and shall require Subcontractors and Vendors to, enter into a warranty agreement directly with Owner in a form reasonably acceptable to Owner reflecting all warranties and guarantees specified in the Contract."  All such warranties "shall be signed jointly by Contractor and each

16

Subcontractor or Vendor."  Finally, under the April 30, 2013 Project Manual, Section 1.7, by the architect Bergman Wall & Associates, the Contractor and subcontractor are required to provide Owner with a five (5) year warranty against defects and damage caused thereby. Contractor to date has failed to provide the warranties required by the Agreement.

        **2.**      **Contractor failed to correct outstanding punch list items and defective and non-conforming Work as required under the Agreement despite repeated notice to do so.**

      63.      On multiple occasions Contractor has been notified of numerous defective and non-conforming Work and outstanding punch list items, but has refused or failed to correct these items as required under the Agreement.

      64.      Since March 2014, Owner has provided Contractor with a significant number of observation reports detailing deficiencies in the Work.

      65.      Owner repeatedly reminded Contractor of its obligations under Section 10.5 of the Agreement to promptly correct its defective and non-conforming Work and outstanding punch list items including, but not limited to, letters dated June 10, 2015, June 24, 2015, and October 31, 2015.

      66.      To date, Contractor has refused or failed to correct these issues.

      67.      In September 2015, Contractor was provided a report prepared by Wiss, Janney, Elstner Associates, Inc. ("WJE"), a consultant engaged by both Contractor and Owner, which detailed certain portions of the Work that needed to be corrected

      68.      Contractor has failed to correct the items found by WJE.

      69.      As of the date of this filing—nearly a year after the Project opened – a substantial number of individual punch list, defective and/or non-conforming Work items remain to be completed by Contractor.

70.     Additionally, due to Contractor's failure to correct defective and non-conforming Work, Owner has been forced to commence correction of certain defective tile work on the Project.

**3.      Because of Contractor's failures, Owner is justified under the Agreement to withhold payment on disputed pay applications to protect against overpayment and potential damages.**

71.     Pursuant to Section 5.3 of the Agreement, Owner is only required to make progress payments within 30 days of an approved payment application which is "properly due and undisputed."

72.     Under the Agreement, Owner has the right to dispute Contractor's applications for progress payments, and has no obligation to pay disputed amounts to Contractor.  Any payment application submitted by Contractor that has not been paid in full has been disputed by Owner.

73.     Under Section 5.6 of the Agreement, Owner is entitled to withhold Retention in the amount of five percent (5%) from each approved pay application.

74.     Furthermore, pursuant to Section 5.4 of the Agreement, as one of its non-exclusive remedies, Owner is entitled to withhold "the amount which, in Owner's reasonable opinion, is necessary to protect Owner against or compensate Owner for any and all damages, costs, lawsuits claims, overpayments, expenses and losses" attributable to Contractor's failure to adequately perform under the Agreement.

75.     Because of Contractor's (a) lack of progress on addressing and correcting defective and non-conforming Work, including outstanding Punch List Items in accordance with the Agreement, as well as work performed and/or costs incurred by Owner, (b) the refusal by Contractor to provide reasonably requested back-up documentation and/or (c) Contractor's refusal to cause its subcontractors to cooperate with audits requested by Owner, Owner asserted

its right to withhold further payments under Section 5.4 of the Agreement and also pursuant to Sections 5.4.2; 5.4.3; 5.4.4; 5.4.6; 5.4.7; 5.4.16; and 5.4.22.  Despite the foregoing, and in order to alleviate potential financial hardship to various subcontractors, Owner has paid Contractor, on behalf of various subcontractors, Eleven Million One Hundred Two Thousand Six Hundred Thirty Seven and 64/100 Dollars ($11,102,637.64) since it notified Contractor of its intent to place Contractor in default in June 2015.

76.     Upon review of the matters affected by the above enumerated defaults by Contractor, Owner has reasonably determined that, as of the date of this filing, the amount which is necessary to protect Owner against any and all damages, costs, lawsuits, claims, overpayments, expenses and losses relating to these matters is at least Eighteen Million Two Hundred Seventy Five Thousand and 00/100 Dollars ($18,275,000.00).

77.     This estimated withholding amount was reasonably derived based on estimated corrective costs and also includes the concerns revealed from preliminary audits[5] relating to OCIP, Edwards, LCE, Jesco, and MCC, as previously discussed in this Complaint.

E.     **Owner's attorneys' fees are recoverable under the Agreement.**

78.     Finally, under Section 24.14 of the Agreement, if Owner prevails in this litigation, it is entitled to recover "all costs and expenses of suit including actual attorneys' fees."

## CAUSE OF ACTION I: BREACH OF CONTRACT

79.     Owner re-alleges and incorporates the preceding paragraphs as if stated in full herein.

80.     Owner and Contractor executed the Agreement.

---

[5] The preliminary audits were performed based on minimal data provided by Contractor and, due to the fact that Contractor has failed to cause its subcontractors to provide full access to their books and records, is not based on direct information from subcontractors.

81.     Contractor's failure to perform Work required by the Agreement is a breach of contract.

82.     Contractor's failure to perform Work at the standards set forth in the Agreement is a breach of contract.

83.     Contractor's failure to perform Work according to industry standards is a breach of contract.

84.     Contractor's failure to correct defective and non-conforming Work, punch list items, and other outstanding work in a timely manner after demand that it do is a breach of contract.

85.     Contractor's failure to keep the Project clean in accordance with the Agreement is a breach of contract.

86.     Contractor's failure to provide sufficient back up documentation to support its pay applications is a breach of contract.

87.     Contractor's submittals of amounts in excess of the actual Cost of the Work for payment are breaches of contract.

88.     Contractor's failure to allow Owner to perform requested audits of Contractor's documents in order to confirm Contractor's costs is a breach of contract.

89.     Contractor's failure to allow Owner to perform audits of Contractor's subcontractor's books and records in order to confirm their and Contractor's costs and Contractor's failure to assist Owner in conducting these audits are breaches of contract.

90.     Contractor's breaches described above are continuing in nature.

91.     As a result of Contractor's breaches of the Agreement, Owner has incurred costs and expenses including, but not limited to, expert and testing costs, and continues to suffer financial loss and other damages.

## CAUSE OF ACTION II: BREACH OF WARRANTY

92.     Owner re-alleges and incorporates the preceding paragraphs as if stated in full herein.

93.     Contractor expressly warranted its performance of the Work under the Agreement.

94.     Contractor expressly warranted that the Work will be performed in accordance with the Contract Documents and "the best practices, methods and standards followed by contractors constructing 'five star' first class luxury resorts."

95.     Contractor expressly warranted that the Work will be "first class in quality, free from all defects whatsoever (including without limitation, patent, latent or developed defects or inherent vice)."

96.     Despite being provided numerous notices regarding the defective and non-conforming work, and being given a reasonable opportunity to cure, Contractor has not remedied its defective and non-conforming Work.

97.     Contractor has breached its express warranty because the Work does not comply with the specifications and standards established by the Agreement, is not fit for its intended use, is non-conforming, and Owner, at a minimum, should be entitled to substantial credits for such defective and non-conforming Work.

98.     By failing to perform Work that meets the express warranty, and failing to remedy known defects, the warranty has failed its essential purpose.

99.    Contractor has breached its warranty obligation by demanding additional compensation to perform post-substantial completion work to correct its defective and non-conforming Work.

100.    As a result of Contractor's breaches of its express warranty, Owner has suffered financial loss and other damages.

## CAUSE OF ACTION III: BREACH OF IMPLIED WARRANTY

101.    Owner re-alleges and incorporates the preceding paragraphs as if stated in full herein.

102.    Contractor impliedly warranted that the Work provided to Owner would be free from defects and were suitable for the purpose for which they were designed and constructed—namely to serve as a five star first class luxury resort without any defects whatsoever.

103.    Certain Work performed by Contractor for Owner was defective at the time performed by Contractor and remains defective and non-conforming despite Contractor having adequate time and opportunity to cure the defects.

104.    The Agreement, under which Contractor contracted to construct the Project created an implied warranty of merchantability, which Contractor breached by constructing a Project that fails to comport with the design specifications and quality standard outlined under the Agreement.

105.    The Agreement also gave rise to an implied warranty of fitness for a particular purpose.  In particular, under the detailed specifications and standards outlined in the Agreement, Contractor knew Owner's particular purpose was to construct a five star first class luxury resort without any defects whatsoever

106.    Owner relied on Contractor's ostensible construction and supervision skills to construct a project that met these precise specifications and standards, and Contractor had reason to know that Owner was relying on Contractor's skill and expertise.  Contractor breached this implied warranty by designing and delivering construction that did not comply with the Agreement's specifications and standards.

107.    Contractor breached the implied warranties of merchantability and fitness for a particular purpose.  Contractor was notified of the defects in the Project but failed to correct them.

108.    As a result of Contractor's breach of these implies warranties, Owner has suffered financial loss and other damages.

## CAUSE OF ACTION IV: NEGLIGENCE

109.    Owner re-alleges and incorporates the preceding paragraphs as if stated in full herein.

110.    Contractor owed a duty to Owner to provide accurate amounts for the Cost of the Work in pay applications.

111.    Contractor's submittals of amounts in excess of the actual Cost of the Work for payment are breaches of this duty.

112.    Contractor owed a duty to Owner to perform construction work on the Project in strict accordance with the Agreement and in a good and workmanlike manner consistent with industry standards and consistent with the heightened standards agreed upon by Contractor in the Agreement.

113.    Contractor breached this duty, and as a result caused or allowed the defects and damage described above.

114.    As a result of Contractor's negligent performance, Owner has incurred and will continue to incur substantial expense repairing and replacing the various defects in the Project, or is entitled to a substantial credit for accepting non-conforming or defective Work.

115.    In addition, Owner will incur substantial additional maintenance expense over the life of the Project as a result of Contractor's negligence.

116.    In addition, Owner has suffered damage to its reputation and the reputation of the Project as a result of Contractor's negligent performance.

117.    In addition, Owner has suffered and will continue to suffer financial loss and other damages.

## CAUSE OF ACTION V: NEGLIGENT MISREPRESENTATION

118.    Owner re-alleges and incorporates the preceding paragraphs as if stated in full herein.

119.    Contractor negligently misrepresented material facts regarding amounts incurred by itself and its subcontractors in performance of the Work, as well as the quality of the work performed by itself and its Subcontractors.

120.    Contractor stands in a superior position to Owner in regards to knowledge of the Work it performed and the Work performed by its subcontractors and the quality of the work performed by itself and its subcontractors.

121.    Contractor misrepresented the quality of the Work performed in that it submitted pay applications for Work which it knew or should have known was either unnecessary, duplicative of other work performed, defective, negligently performed, or did not meet the quality standards set forth in the Agreement.

122.    Due to its superior position of knowledge, Contractor had a duty, at the time it submitted its pay applications, to inform Owner of the defective nature of the Work, the substandard quality of work being claimed, the actual value of the Work performed, and whether or not such work was necessary in performance of the Agreement.

123.    These misrepresentations were made as inducement for Owner to approve Contractor's pay applications.

124.    Owner reasonably and justifiably relied upon Contractor's representations that the Work was in compliance with the Agreement when it approved Contractor's pay applications.

125.    Contractor's representations were false and resulted in substantial harm to Owner, including financial loss and other damages.

## CAUSE OF ACTION VI: NEGLIGENT SUPPRESSION

126.    Owner re-alleges and incorporates the preceding paragraphs as if stated in full herein.

127.    Contractor negligently suppressed material facts regarding amounts incurred by itself and its subcontractors in performance of the Work, as well as the quality of the work performed by itself and its Subcontractors.  Most notably, Contractor knew or should have known the Work was defective and non-conforming.

128.    Contractor stands in a superior position to Owner in regards to knowledge of the Work it performed and the Work performed by its subcontractors and the quality of the work performed by itself and its subcontractors.

129.    Contractor suppressed information regarding the quality of the Work performed in that it submitted pay applications for Work which it knew or should have known was either

unnecessary, duplicative of other work performed, defective, negligently performed, or did not meet the quality standards set forth in the Agreement.

130.    Due to its superior position of knowledge, Contractor had a duty, at the time it submitted its pay applications, to inform Owner of the defective nature of the Work, the substandard quality of work being claimed, the actual value of the Work performed, and whether or not such work was necessary in performance of the Agreement.

131.    Additionally, Contractor has failed to provide backup documentation or allow an audit of the financial records of its subcontractors in order for Owner to ascertain the exact value of the Work performed.

132.    Contractor's suppression has resulted in Owner being overbilled and overpaying for work performed by Contractor to date.

133.     As a result of Contractor's suppression, Owner has suffered financial loss and other damages.

## CAUSE OF ACTION VII: DECLARATORY JUDGMENT

134.    Owner re-alleges and incorporates the preceding paragraphs as if stated in full herein.

135.    Under the Agreement, Owner is entitled to perform all audits of Contractor and its subcontractors that Owner deems necessary in order to determine the validity of the Costs submitted by the Contractor for payment.

136.    Contractor has repeatedly refused to allow Owner to perform the requested audits or to assist Owner in conducting such audits of the subcontractors.

137.    Moreover, Owner has self-performed certain work and incurred costs associated with Contractor's failure to perform for which Owner is entitled to credits under the Agreement.

138.    Accordingly, Owner is entitled to a declaratory judgment that Contractor is required under the Agreement to immediately provide Owner and Owner's selected auditor access to Contractor's documents relating to its claims for payment on the Project and whether Owner is entitled to any credits for amounts previously billed or to be billed.

139.    Owner is also entitled to a declaratory judgment that Contractor is required under the Agreement to immediately provide all assistance necessary to facilitate Owner's and Owner's selected auditor's access to the documents of Contractor's subcontractors relating to the claims for payment submitted by Contractor on the Project and whether Owner is entitled to any credits for amounts billed or to be billed.

WHEREFORE, Owner respectfully requests this Court enter relief in the following particulars: damages proximately caused by Contractor's multiple breaches of contract, express warranty, and implied warranty, and its negligence in an amount to fully compensate Owner for its actual and economic damages including, but not limited to, loss of profits, delay and downtime expenses and losses, diminished value to the Project, future repair expenses due to the defects that Contractor has failed to remedy, costs to complete punch list items, costs to repair defective and non-conforming work, and all other economic and financial damages allowed by law or equity; pre and post-judgment interest; reasonable attorneys' fees and costs incurred by Owner in pursuing this litigation; and any and all other such general and equitable relief as this Court may deem appropriate.

Owner also respectfully requests this Court enter a declaratory judgment declaring that Contractor is (i) required under the Agreement to immediately provide Owner and Owner's selected auditor access to Contractor's documents relating to its claims for payment on the Project, (ii) required to immediately provide all assistance necessary to facilitate Owner's and

Owner's selected auditor's access to the documents of Contractor's subcontractors relating to the claims for payment submitted by Contractor on the Project, and (iii) required to give Owner credits for amounts billed or to be billed.

DATED:  November 25, 2015

Respectfully submitted,

/S/ Gregory E. Bodin_____
**BAKER DONELSON BEARMAN**
**CALDWELL & BERKOWITZ, PC**
Gregory E. Bodin (La. Bar No. 18802) T.A.
Chase North Tower
450 Laurel Street, 20th Floor
Baton Rouge, Louisiana  70810
Telephone: (225) 381-7000
Facsimile: (225) 382-0230

AND

Edward Meyerson
Donald J. Nettles
Wells Fargo Tower
420 20th Street North, Suite 1400
Birmingham, AL 35203
Telephone: 205.244.3828
Facsimile:  205.488.3828
dnettles@bakerdonelson.com
(*Pro Hac Vice* Application Pending)
**Attorneys for Plaintiff Golden Nugget Lake Charles,**
**LLC, f/k/a Ameristar Casino Lake Charles, LLC, f/k/a**
**Creative Casinos of Louisiana, LLC**

## **Certificate of Service**

I hereby certify that I have served a copy of the foregoing document by Certified U.S.

Mail on this the 25th day of November, 2015 to the following:


W.G. Yates & Sons Construction Company
c/o its registered agent C T CORPORATION SYSTEM
3867 Plaza Tower Drive
Baton Rouge, LA 70816

/S/ Gregory E. Bodin_____

29